IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Lee A. Donaldson,                    )
John Capuano,                        )
                                     )
          Plaintiffs,                )
                                     )   Civil Action No.  08-605
     vs.                             )
                                     )
Informatica Corporation              )
                                     )
                                     )
          Defendant.                 )

AMBROSE, District Judge

## OPINION
### and
### ORDER OF COURT

This is a diversity case in which Plaintiffs have brought state law claims against Defendant Informatica Corporation ("Defendant" or "Informatica") alleging: breach of contract, detrimental reliance, quantum meruit, violation of Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. § 260.1, *et seq.*, and defamation *per se* in violation of 42 Pa. Stat. § 8343(a). Plaintiffs' claims arise from Informatica's alleged failure to pay them appropriate commissions and alleged defamatory statements related thereto. Pending before the Court is Defendant Informatica Corporation's Motion for Summary Judgment. (Docket No. 73). Also pending is a Motion for Partial Summary Judgment filed by Plaintiffs Lee Donaldson ("Donaldson") and John Capuano. ("Capuano") (Docket No. 77). After a careful review of the submissions by the parties and for the reasons discussed in this Opinion, Defendant's Motion for Summary Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied.

## I. **BACKGROUND**

### A. **Factual Background**

Unless otherwise indicated, the following material facts are undisputed.

### 1. **Plaintiffs' Employment with Informatica and Informatica's Sales Structure**

Informatica, headquartered in Redwood City, California, produces a sophisticated software platform that integrates data from a variety of different software platforms so that all users can access the entire body of data from the various software platforms. Informatica hired Plaintiff Donaldson as a Major Account Manager in February 2005. As a Major Account Manager, Donaldson sold Informatica's software products to specific end users or accounts in an assigned region of the United States. According to Donaldson, Informatica terminated his employment effective June 2, 2009 (after Informatica filed its Concise Statement of Undisputed Material Facts). Donaldson Aff. ¶ 3 (Docket No. 83-2).

From 2006 through May 2008, Donaldson reported to Plaintiff Capuano who was employed as a Regional Manager for Informatica. Capuano, who resided in Illinois during his employment, resigned in May 2008. Capuano reported to Ron Ariana, Area Vice President. Ariana reported to Brad Crosby, Senior Vice President of Sales for the Americas. Crosby reported to Paul Hoffman, Executive Vice President of Worldwide Field Operations. Hoffman reported to Chief Executive Officer, Sohaib Abbasi.

### 2. **Informatica's Compensation Plan**

In addition to base salaries, Capuano and Donaldson were eligible for commissions pursuant to the 2008 Worldwide Incentive Compensation Terms & Conditions ("WICTC").[1] In support of their breach of contract claims in this lawsuit, Plaintiffs identify Section F of Appendix 2 of the WICTC as the section that Informatica allegedly breached. This section provides:

---

[1] A copy of the WICTC is attached, *inter alia*, as Exhibit 3 to the Appendix in Support of Plaintiffs' Motion for Partial Summary Judgment. (Docket No. 80, Ex. 3).

Where there is a transfer of an account between salespersons, typically at the start of the fiscal, the account may be subject to a "hold" by the prior salesperson. Quota, commission and/or bonus credit for transactions closed within three months of the transfer date will be given 100% to the prior salesperson for the account. If applied, the same splits will apply up the management chain. After the three month period from the transfer date has passed, the New Account owner will receive 100% quota and/or bonus credit.

In some cases when there is a transfer of an account between salespersons quota, commission and/or bonus credit may be split on transactions closed within three months of the transfer date as follows, subject to the Quota Credit Allocation guidelines in Section F above:

| Period after Transfer Date | Previous Account Owner | New Account Owner |
|---|---|---|
| Month 1 | 75% | 25% |
| Month 2 | 50% | 50% |
| Month 3 | 25% | 75% |

If applied, the same splits will apply up the management chain. The total quota and/or bonus credit will not exceed 100%. After the three month period from the transfer date has passed, the New Account owner will receive 100% quota and/or bonus credit.

All holds and/or splits require the approval of the Vice President, Sales in each territory affected or the Executive Vice President, Worldwide Field Operations.

WICTC, App'x 2, § F. Donaldson is a salesperson within the meaning of this section of the WICTC.

A transfer of an account precedes a hold, and thus a hold would not come into effect until after the

transfer date happened. Informatica's Vice President of Sales and/or the Executive Vice President

of Worldwide Field Operations have the ability to grant or deny a hold.

## 3. The Reorganization of Informatica Sales Territories and the Second Dell Sale

In late 2006, Informatica announced a reorganization of its sales territories. Specifically,

Informatica condensed from three sales territories – East, Central, and West – to two sales

territories – East and West. As a result of the reorganization, some accounts changed hands.

Two of the accounts impacted by the reorganization were Dell and Embarq. Prior to the

reorganization, the Dell account had been assigned to the Capuano-Donaldson sales team, while

3

the Embarq account had been assigned to their peers: Major Accounts Manager Steve Johnson and Regional Manager Monica Froebe.

The deposition testimony reflects that Vice Presidents for the respective sales territories, Ariana and Jeff Marion, agreed that Marion's team would retain the Embarq account and that Ariana's team would retain the Dell account for another year, until the end of 2007. The parties dispute, however, the details of this agreement. Informatica contends that, although holds are typically three months in length, Ariana and Marion agreed to a one-year "hold" on the Dell account for the Capuano-Donaldson sales team within the meaning of the WICTC. Likewise, the Froebe-Johnson sales team received a one-year hold on the Embarq account. Consequently, according to Informatica, Capuano and Donaldson were entitled to receive 100% of commissions on any sales to Dell that closed in 2007. Plaintiffs dispute that there was a one-year hold on the Dell or Embarq accounts. In Plaintiffs' view, the arrangement was not a "hold," but a "swap" of accounts, whereby both sales teams benefitted. Plaintiffs also dispute that the Dell account transferred on January 1, 2007 and contend that the account actually transferred on January 1, 2008.

It is undisputed that Capuano and Donaldson closed a sale to Dell in June 2007 (the "First Dell Sale") and received 100% of the commissions on that sale. During 2007, Capuano and Donaldson also were working on a second sale to Dell (the "Second Dell Sale"). In connection with the Second Dell Sale, Capuano and Donaldson requested – and Informatica granted – special incentives to Dell if the sale closed before the end of 2007. Donaldson and Capuano also exerted extensive efforts to close the Second Dell Sale by the end of 2007. Plaintiffs contend that they requested the special incentives and exerted extensive efforts to close the sale in 2007 because it was their job to do so and the sale was forecasted to close by the end of 2007. Despite Plaintiffs' efforts, the Second Dell Sale did not close in 2007.

In December 2007 and January 2008, Plaintiffs sent numerous e-mails regarding what was going to occur with the Dell account in 2008 in light of the pending Second Dell Sale and seeking

4

to convince Informatica to allow them to close the deal at Dell. Plaintiffs deny that these e-mails acknowledge the expiration of the alleged one-year hold period on the Dell account because they deny that such a hold period existed.

In January 2008, Capuano entered into split negotiations with the Froebe-Johnson team. Informatica contends that Capuano entered into such negotiations in an effort to get some amount of commissions on any Dell sale that might occur in the first quarter of 2008. Plaintiffs aver that Capuano entered into the negotiations in order to provide his team with the compensation they deserved pursuant to their efforts on the Dell sale while still providing the Froebe-Johnson sales team with an incentive to work with Dell going forward after March 31, 2008.

In a January 13, 2008 e-mail, Froebe proposed the following commission split:

John and Ron,

A year ago, a hold agreement was reached that enabled the North Central [Great Lakes] Region to conclude an existing transaction at Dell Computers and continue to sell and manage that account through 2007. Based on this agreement, effective, January 1, [2008] Dell Computers' Account Support responsibilities and revenue recognition returns to the South Central Region.

Dell is a key account and is in the process of considering an additional financial investment. Although we would like to see a quick transition, we also are interested in minimizing disruption and providing a smoother transition for the Customer. With this in mind, the South Central Region is making the following offer:

Lee Donaldson will continue to play a key role throughout the transition in Q1. We believe this will provide for a slower transition, but will provide less disruption with existing commitments for the Customer. In addition, should Dell proceed with a financial transaction in the near term (as communicated), Lee [Donaldson] and the North Central Region will share in the revenue.

In order to accommodate Lee for his continued engagement, we are also offering the following split of compensation:

| (Split %) | North Central | South Central |
|-----------|---------------|---------------|
| January   | 50%           | 50%           |
| February  | 50%           | 50%           |
| March     | 25%           | 75%           |

These timeframes align with those communicated by the North Central Account Team and should provide for a smoother Account transition.

In addition, there are two rules of engagement that we would like to agree upon:

1.    joint approval of any deal prior to being presented to Dell
2.    joint call planning and representation at all meetings[.]

Please respond in writing with your agreement to this transition plan and split arrangement.

Capuano Dep. (Docket No. 76-3) Ex. 6.

Capuano initially responded on January 14, 2008:

Monica and Jeff,

As mentioned below, we agree to the "Rules of Engagement." We all have the same goal of selling Dell successfully and transitioning Dell in a manner that represents Informatica professionally.

While our opinions differ on our view of fairness, and with a certaintly [sic] that we may never agree on this, we need to get this behind us and move forward.

In the interests of moving forward can we adjust the split to the following (below)?

January close – 70 pct Great Lakes, 30 pct South Central
February close – 50 pct Great Lakes, 50 pct. South Central
March close – 30 pct Great Lakes, 70 pct South Central.

I base the January 70% request as an acknowledgment of the effort extended by the account team and position that we are at the end of a time-consuming sales cycle (which is unknown at this moment).

Please consider this so we may move forward on this point.

Sincerely,

John Capuano

Id. In an e-mail dated January 16, 2008, Capuano wrote:

All,

As the manager, and representative, of the Great Lakes region, I agree to the terms and level of credit outlined by Monica Froebe and Jeff Marion.

Please let me know should you have any questions.

Sincerely,

John Capuano

Id. Ex. 7. In his deposition testimony and affidavit, Capuano states that, despite this e-mail, he did not actually agree to Froebe's proposal. Capuano admits that, as a general matter, he could bind Donaldson to a split agreement and, likewise, that Capuano's supervisors could enter into a split agreement that would be binding on him and Donaldson. Id. at 66. In this case, however, Capuano testified that there was not a genuine agreement because he was coerced, pressured, and under duress when he wrote the January 16, 2008 e-mail. Specifically, Capuano claims that Brad Crosby called him in his car, told him to pull over, and instructed him to write an e-mail agreeing to Froebe's split proposal of 50/50, 50/50, 25/75. Capuano states that he objected verbally but, feeling pressured and that his job was in jeopardy, complied and wrote the e-mail. Capuano Dep. (Docket No. 83-6), at 112-114, 162-163; Capuano Aff. (Docket No. 83-7) ¶¶ 87-102. Donaldson testified that he did not agree to the split and already had written to Sohaib Abbasi to request a hold. Donaldson Dep. (Docket No. 83-3) at 185.

The Second Dell Sale closed on March 31, 2008. Capuano and Donaldson were paid 25% of the commissions, and Froebe and Johnson were paid 75%.

## 4. Donaldson's Defamation Claim

On January 15, 2008 (one day before Capuano's e-mail regarding commission splits), Donaldson sent an e-mail to Informatica CEO Sohaib Abbasi. The e-mail stated:

Dear Sohaib:

My name is Lee Donaldson. We have spoken in the past in connection with some of the more significant sales that I have made since joining Informatica in March 2005. I am a member of the Informatica sales team reporting into the Western Sales Region, North America and have been responsible for making three seven figure sales since I began with Informatica. I am communicating directly with you because as an Informatica employee, I feel that I have no other person to turn to with respect to the difficult position that I am currently confronted with as a consequence of my employment with the company.

7

In October 2006, I was assigned the Dell account. In June 2007, we closed a first sale with Dell in the amount of $1.26 in net license fees, including a Master License Agreement for a second transaction. We were on track to close the second deal with Dell in Q1 of 2008 in the amount of over $2 million in net license fees and over $2.3 million in license and maintenance fees. That's when "the rug was pulled out from under me and my team." I was told that I would not be allowed to close the second deal with Dell. This was a decision made not by my immediate supervisor but someone higher up in Informatica. No reason has been given to me for this directive. Not only does this present a substantial economic deprivation to me and my team but to Informatica as well since the Dell contact, Joe Pignatello, has publicly stated that a change of the Informatica sales team at this juncture could jeopardize the entire transaction.

Joe was a guest client speaker at our sales meeting last week in San Francisco. I am sure you heard him say that he believes in developing relationships with the people and vendors with whom he and Dell do business. You may also recall that Joe stated he had developed a trusting relationship with Informatica's sales team of which I have been a key member. To change out the sales team at this point is illogical and not in the best interests of Informatica or my team. I can only conclude that others in Informatica have elected to promote their self interests over those of the company and those who have been responsible for bringing in the Dell business. Simply put, this is unfair to my team, to me, to Informatica and its shareholders and to our customer, Dell.

I have very much enjoyed working for Informatica and have always considered myself a team player. However, these recent events have left me bewildered and confused. The implication now is that if I do not transition the Dell transaction to a new sales team, I will be punished in some manner or perhaps terminated. This has upset me so much that I could not bring myself to attend the sales award dinner last week to accept the "Million Dollar Sales Award" that I had earned as a result of the first Dell sale in Q2 of 2007.

I am asking you or one of your trusted colleagues to please investigate this matter. The Informatica Corporate Code of Business Conduct states that it is predicated upon "*integrity, open communications, decency and fair play and accountability.*" Put yourself in our shoes. If this case can be arbitrarily taken from me and my team, what type of precedent will this establish. No member of the sales team will be safe against this type of illicit poaching. The only thing we are asking is permission to close this deal with Dell for the mutual benefit of my team and Informatica. I am sure that other transactions have been "grandfathered" under like circumstances. As stated at the beginning of this e-mail, I feel that only you are in a position to correct this most unfair and unfortunate situation.

Best regards

Lee

Abbasi Dep. (Docket No.76-5) Ex. 1. Donaldson copied Paul Hoffman, Informatica's Executive

8

Vice President of Worldwide Field Operations on this January 15, 2008 e-mail.

Hoffman drafted an e-mail dated January 16, 2008 in response to Donaldson's original e-mail to Abbasi. The e-mail provided as follows:

> Sohaib,
>
> What Lee has conveniently forgotten to tell you is that he had an extra full-year to get credit on Dell and transition it over to its real territory (normal transitions happen within 90-days at a 75-50-25% rate over those three months). Dell is in Austin. Lee lives in Pittsburgh, PA. It makes no sense for him to cover Dell when we have many reps close by in Texas. It was agreed at the beginning of 2007 that Lee would be able to have a hold on Dell through 2007. When he closed the deal in June, it had an option for an ELA through 12/15. It didn't happen, as you know. Technically, Lee and John Capuano should not be getting any credit for Dell at all in 2007. However, Jeff Marion and Monica Froebe acted as team players and agreed with Brad to provide some additional transition time[.] Lee was then told that if Dell closes by February he will get 50% and if it closes in March, he will get 25%. In my opinion this is a gift to him.
>
> If he wants to talk about integrity, I would encourage him to be honest enough to tell you the full true story. I notice he didn't mention the names of the other big deals he did – probably because one was Abbott Labs – which is the ugly one they did without appropriate approvals. The other interesting question is why he feels YOU are the only one in a position to correct this – when he and I talked at the kickoff and he never mentioned it to me – probably because he knows that I know the facts!
>
> This e-mail certainly will not help his reputation in the company.
>
> Paul

See Donaldson Dep. (Docket No. 76-2) at 139, Ex. 19. According to Informatica, Hoffman intended to send the responsive e-mail to Abbasi with a copy to Brad Crosby, Informatica's Senior Vice President of Sales for the Americas. Instead, Hoffman sent the e-mail to Donaldson (rather than Abbasi) with a copy to Crosby. After sending the e-mail to Donaldson, Hoffman forwarded it to Abbasi with a note explaining:

> Sohaib, although Lee did close Abbott Labs and it wasn't a great deal for us, he inherited it when another rep left. The deal I meant to refer to was Eli Lilly, which was a worse deal (3 year ELA for $1.35MM) that was presented to the customer without approvals. Now he did work for Dan Rabella who reported to Steve Johnson at the time (2005).

Hoffman Dep. (Docket No. 76-6), Ex. 2.

9

Besides Donaldson (and any individual to whom Donaldson sent the Hoffman email), only three individuals received the Hoffman email: Abbasi, Crosby, and Stoner (Senior Vice President of Human Resources). All three recipients are Informatica executives. Neither Crosby nor any of the managerial recipients sent this email to anyone outside Informatica.

## B. Procedural History

On or about September 9, 2008, Plaintiffs filed a First Amended Complaint against Defendants. (Docket No. 35). Informatica filed a Motion to Dismiss Counts V and X of the Amended Complaint and supporting brief on September 26, 2008. (Docket Nos. 37-38). On that same date, former Defendant Paul Hoffman filed a Motion to Dismiss Count VI of the Amended Complaint and supporting brief. (Docket Nos. 39-40). Also on September 26, Informatica filed an Answer to the remaining counts against it in the Amended Complaint. (Docket No. 41). On December 16, 2008, the parties filed a Stipulation of Dismissal with prejudice as to Count X of the Amended Complaint, which I granted on December 17, 2008. (Docket Nos. 56, 58). On February 25, 2009, I entered an Order granting Hoffman's Motion to Dismiss and denying Informatica's Motion to Dismiss. (Docket No. 62).

On May 20, 2009, Informatica filed its Motion for Summary Judgment and supporting materials. (Docket Nos. 73-76). Plaintiffs filed a Brief in Opposition, Counterstatement of Facts, and Appendix on June 22, 2009. (Docket Nos. 81, 83, 87). Informatica filed a Reply Brief and Response to Plaintiffs' Second Concise Statement of Undisputed and Material Facts on July 10, 2009. (Docket Nos. 89-90). Also on May 20, 2009, Plaintiffs' filed their Motion for Partial Summary Judgment and supporting materials. (Docket Nos. 77-80). On June 22, 2009, Informatica filed a Brief in Opposition and Response to Concise Statement of Material Facts. (Docket Nos. 85-86). Plaintiffs filed a Reply Brief on July 1, 2009. (Docket No. 88).

The motions are now ripe for my review.

## II. LEGAL ANALYSIS

### A. Standard of Review

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." White v. Westinghouse Elec. Co.,

11

862 F.2d 56, 59 (3d Cir. 1988) (quoting Celotex, 477 U.S. at 322).

With this standard in mind, I turn now to the issues of this case.

### B. Plaintiffs' Motion for Partial Summary Judgment

As set forth above, Section F of Appendix 2 of the WICTC ("Section F") – the section

Plaintiffs contend that Informatica breached – provides:

> **Where there is a transfer of an account between salespersons, typically at the start of the fiscal, the account may be subject to a "hold" by the prior salesperson.    Quota, commission and/or bonus credit for transactions closed within three months of the transfer date will be given 100% to the prior salesperson for the account.   If applied, the same splits will apply up the management chain.   After the three month period from the transfer date has passed, the New Account owner will receive 100% quota and/or bonus credit.**

> In some cases when there is a transfer of an account between salespersons quota, commission and/or bonus credit may be split on transactions closed within three months of the transfer date as follows, subject to the Quota Credit Allocation guidelines in Section F above:

| Period after Transfer Date | Previous Account Owner | New Account Owner |
|---|---|---|
| Month 1 | 75% | 25% |
| Month 2 | 50% | 50% |
| Month 3 | 25% | 75% |

> If applied, the same splits will apply up the management chain.  The total quota and/or bonus credit will not exceed 100%.  After the three month period from the transfer date has passed, the New Account owner will receive 100% quota and/or bonus credit.

> **All holds and/or splits require the approval of the Vice President, Sales in each territory affected or the Executive Vice President, Worldwide Field Operations.**

WICTC, App'x 2, § F (emphasis added).

In their motion for partial summary judgment, Plaintiffs argue that this contractual provision

is clear, unambiguous, and susceptible to only one meaning.  Specifically, Plaintiffs assert that "it

is inescapable" that Section F means:

> When an account that has been the responsibility of one salesman is transferring to another salesperson, the original salesman (not manager) can ask to hold onto an active sales opportunity that he anticipates will close within ninety days and he will receive all of the commission for that sale if it does in fact close. Furthermore, the original salesperson (not manager) will be granted his requested hold if it falls within the criteria of an active opportunity – one that is likely to close within ninety days.

Pls.' Br. Supp. (Docket No. 78), at 14. Accordingly, Plaintiffs request that I interpret the first paragraph of Section F to mean that "when an account is transferring from one salesperson to another, the original salesperson has an *[sic]* right to subject an active opportunity for a sale within that account to a hold for ninety days, providing him the opportunity to work on the sale and close it, thereby receiving one hundred percent of the commission earned from that sale." Pls.' Motion (Docket No. 77) at 2; Pls' Br. Supp. (Docket No. 78), at 14. Plaintiffs further request that I interpret the last paragraph of Section F to mean that "the salesman's request for a hold will be granted by the Vice President of Sales, or the Executive Vice President, Worldwide Field Operations if the hold that they are requesting qualifies as an active opportunity that will likely close within ninety days." Id. After careful review of the WICTC and the submissions of the parties, I find that Plaintiffs' request is without merit.

Determining the intention of the parties is a paramount consideration in the interpretation of any contract. Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385, 389 (Pa. 1986). It is well established that "the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Steuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982); see also Seven Springs Farm, Inc. v. Croker, 748 A.2d 740, 744 (Pa. Super. Ct. 2000) ("When the language of a contract is unambiguous, [the court] must interpret its meaning solely

from the contents within its four corners, consistent with the plainly expressed intent.").[2] "The Court
must construe the contract only as written and may not modify the plain meaning under the guise
of interpretation." McMahon v. McMahon, 612 A.2d 1360, 1364 (Pa. Super. Ct. 1992). As the
Pennsylvania Supreme Court long has stressed, "'[i]t is not the province of the court to alter a
contract by construction or to make a new contract for the parties; its duty is confined to the
interpretation of the one which they have made for themselves, without regard to its wisdom or
folly.'" Steuart, 444 A.2d at 662 (quoting Moore v. Stevens Coal Co., 173 A. 661, 662 (Pa. 1934)).

Here, I agree that the contract language at issue is clear and unambiguous. I disagree with
Plaintiffs, however, that anything in Section F of the WICTC even remotely suggests, let alone
plainly and unambiguously states, that a salesperson is *entitled* to subject any "active opportunity"
for a sale within a transferred account to a hold or that Informatica management *must* grant such
a hold request. To the contrary, the first sentence of Section F plainly states that "[w]here there is
a transfer of an account between salespersons, . . . the account **may** be subject to a hold by the
prior salesperson." It is beyond dispute that "may" is a permissive, not mandatory, term. See, e.g.,
Source Search Techs., LLC v. Lending Tree, LLC, No. 04-4420, 2007 WL 1302443, at *8 (D.N.J.
May 2, 2007) (contrasting permissive "may" and "can" with mandatory "must"). Similarly, the last
sentence of Section F plainly states that "**all** holds and/or splits **require the approval** of the Vice
President, Sales in each territory affected or the Executive Vice President, Worldwide Field
Operations." WICTC, App'x 2, § F (emphasis added). This sentence further demonstrates that
holds are not automatic and that salespersons do not have a unilateral right to a hold.

In addition, paragraph two of Section F provides that "[i]n some cases when there is a
transfer of an account between salespersons, quota, commission and/or bonus credit **may be split**

---

[2]  Under Pennsylvania law, unambiguous writings are interpreted by the court as a matter of law;
ambiguous writings are interpreted by the fact finder. Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619
F.2d 1001, 1011 n.10 (3d Cir. 1980).

on transactions closed within three months of the transfer date," thus providing an alternative permissive arrangement following an account transfer. Id. (emphasis added). Plaintiffs fail to satisfactorily explain why the contract would provide for a split arrangement if all salespersons were entitled to a hold for every active opportunity on a transferred account. It also is undisputed that the phrase "active opportunity" does not appear anywhere in the WICTC and that the WICTC does not contain any language requiring Informatica to approve a hold in any circumstance, let alone any time a salesperson has an "active opportunity." The absence of such language is a further example of why the plain meaning of the contract is not the meaning Plaintiffs urge.[3]

Plaintiffs further argue that Informatica's own admissions buttress Plaintiffs' version of the plain and unambiguous meaning of Section F, including that "the approval of a hold by Informatica should be freely granted when the salesperson requests a hold on a sale that qualifies as an active opportunity as defined by Informatica." Pls.' Br. Supp. (Docket No. 78) at 9-13. This argument is meritless. Even if it were proper for me to look outside the four corners of the WICTC for guidance, nothing in the record evidence validates Plaintiffs' conclusion. To the contrary, when asked about this very issue, Informatica's Rule 30(b)(6) designee, Joanne Stoner, testified that such a conclusion was not accurate:

> Q. I understand. But I'm looking from the company's standpoint. . . . A company will grant holds if it deems there to be a genuine active opportunity in the account, right?

---

[3] In addition to Appendix 2, Section F, Section II.D of the WICTC provides:

The Company shall make the final and binding determination of any amount payable under the Plan and reserves the right to adjust, modify or change the Incentive Plan and/or these Terms and Conditions at any time before a commission or bonus vests and is deemed to have been earned, either during or after the close of the fiscal quarter or fiscal year. Commissions and bonuses do not vest and are not deemed to have been earned, until the Company makes any and all final determinations and adjustments, modifications or changes. Adjustments, modifications and changes may be made to bonuses, commissions, commission rates, quotas, territories or any other terms and conditions and may result in a decrease or increase in compensation. Such changes are valid only if approved by the Executive Vice President, Worldwide Field Operations or his/her designee.

15

A. **Not always.**

Stoner Dep. (Docket No. 80, Ex. 2) at 36 (emphasis added).[4]

Indeed, in their Reply Brief, Plaintiffs *agree* that "the language of the Comp plan is permissive as opposed to mandatory and that holds require the approval of Informatica executives." Pls.' Reply Br. (Docket No. 88) at 3; see also id. at 4 ("Defendant correctly states that holds are permissive, not mandatory."). Perhaps recognizing that the applicable contractual language does not directly support their requested interpretation, Plaintiffs argue in their Reply Brief that even though holds are not mandatory under the contract, Defendant does not have unfettered discretion when deciding whether to grant a hold. Id. Rather, the Court can read into the contract that approval or disapproval of hold request must be rendered in good faith. Id. at 5. Accordingly, Plaintiffs urge, "when an account is transferring and a salesperson requests a hold, if that hold is on an active opportunity within an account, Defendant must use its discretion in good faith and grant the request." Id. I disagree.

Courts applying Pennsylvania law "have cited Restatement (Second) of Contracts § 205 for the proposition that every contract has an implied term that the parties will perform their duties in good faith." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000). These courts primarily "have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." Id. A party to a contract breaches the duty of good faith "if it evades the spirit of the bargain, acts with a lack of diligence, willfully renders imperfect performance, abuses the

---

[4] Even assuming, as Plaintiff contends, that Stoner testified that the primary criterion Informatica uses when determining whether to grant a hold is whether there is an "active opportunity," it does not follow from such testimony that Informatica must grant a hold each time there is such an opportunity. To the contrary, both the language of the WICTC and Stoner's testimony quoted above demonstrate that this is not the case.

16

power to specify terms, interferes with or fails to cooperate in the other party's performance, or exercises contractually authorized discretion in an unreasonable manner." <u>Berks Mut. Leasing Corp. v. Travelers Prop. Cas.</u>, No. 01-CV-6784, 2002 WL 31761419, at *3 (E.D. Pa. Dec. 9, 2002). In applying these principles, however, courts must proceed with caution or else "the doctrine could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." <u>Northview Motors</u>, 227 F.3d at 92.

Here, as set forth above, the applicable contractual language specifically provides that holds are permissive and require executive approval.  To read into the contract a mandate that Informatica approve any hold requested on any active opportunity in a transferred account under the guise of the good faith doctrine would be to use that doctrine to override the contract's express terms.  As stated above, the courts cannot invoke the good faith doctrine for such a purpose.

In short, I find that Section F of Appendix 2 to the WICTC means what it says – that a salesperson responsible for a transferred account *may* request a hold on a sales opportunity within that account and that the Vice President, Sales in each territory affected or the Executive Vice President, Worldwide Field Operations *may* grant such a request.  The WICTC does not entitle salespersons to a hold or *require* Informatica to grant a hold under any circumstances and, accordingly, Plaintiffs' Motion for Partial Summary Judgment is denied.

### C. **Defendant's Motion for Summary Judgment**

#### 1. **Breach of Contract**

The essence of Plaintiffs' argument in support of its breach of contract claim is that the clear and unambiguous language of the WICTC – specifically, Appendix 2, Section F – entitled Donaldson to a hold on the Dell account after January 1, 2008 and, therefore, entitled Plaintiffs to 100% of the commission on the Second Dell Sale which closed in March 2008.  Pls.' Opp. Br. at 9.  Thus, according to Plaintiffs, Informatica breached the WICTC when it did not grant Donaldson

17

a hold and did not pay Plaintiffs 100% of the commission at issue. Informatica moves for summary judgment as to the breach of contract claim on the grounds that nothing in the WICTC obligated the company to grant a hold and that the company paid Plaintiffs all sums owed. For the reasons set forth below, I agree that summary judgment in favor of Informatica on this claim is proper.

As set forth above, Plaintiffs have not identified any language in the WICTC granting salespersons a unilateral right to a hold or obligating Informatica to grant Donaldson a hold. To the contrary, the plain and unambiguous language of Section F states that a salesperson responsible for a transferred account *may* request a hold on a sales opportunity within that account and that the Vice President, Sales in each territory affected or the Executive Vice President, Worldwide Field Operations *may* grant such a request. The WICTC does not entitle salespersons to a hold or *require* Informatica to grant a hold under any circumstances. See supra Section II.B. Indeed, Plaintiffs admit in their briefing that the WICTC language is permissive as opposed to mandatory and that holds require executive approval. See id. Plaintiffs further admit that Informatica never granted them a hold for the Second Dell Sale. See id.

Plaintiffs' additional arguments in opposition to Defendant's summary judgment motion are unpersuasive. First, Plaintiffs cite the deposition testimony of Informatica's 30(b)(6) designee, Joanne Stoner, as evidence that the plain and ordinary language of the WICTC entitled Plaintiffs to 100% commission on the Second Dell Sale. Specifically, Plaintiffs argue that Stoner identified only one criterion to which Informatica executives look when determining whether to grant a hold – whether the sales opportunity that is the subject of the hold request is an "active opportunity," *i.e.*, a sale expected to close within ninety days. Pls.' Opp. Br. at 9-10. Plaintiffs state that, according to Stoner, only active opportunities may be subject to a hold. Id. at 9. Even if a sales opportunity has to be "active" for a hold to be granted, however, it does not follow that the WICTC *requires* Informatica to grant a hold in all such situations. Again, as set forth in Section II.B., supra, when asked about this very issue, Stoner testified that such a conclusion was not accurate:

> Q. I understand. But I'm looking from the company's standpoint. . . . A company will grant holds if it deems there to be a genuine active opportunity in the account, right?
>
> A. ***Not always.***

Stoner Dep. (Docket No. 80, Ex. 2) at 36 (emphasis added).[5]  Thus, even if it is appropriate to consider material outside the four corners of the contract, Stoner's testimony does not support Plaintiffs' breach of contract theory.

Second, Plaintiffs assert that summary judgment in favor of Informatica is not warranted because there is a genuine factual dispute regarding the date of the transfer of the Dell account and whether Plaintiffs had a one-year hold on the Dell account in 2007.  In particular, Plaintiffs dispute Informatica's contention that the Dell account transferred from Donaldson and Capuano on January 1, 2007, but that Donaldson and Capuano retained a one-year hold on that account during 2007.  Plaintiffs contend that the Dell account did not transfer until January 1, 2008 and that the arrangement in 2007 was an account "swap" through which Donaldson retained the Dell account for the year even though it was not part of his new territory.  See Pls.' Opp. Br. at 10-14. Plaintiffs contend that Donaldson's first and only request for a hold came in January 2008 coincident with the transfer date of the account.  See id. at 10.

Even assuming there is a genuine issue with respect to these facts, however, the factual dispute is not material.  The pertinent issue here, as framed by Plaintiffs, is whether Informatica's refusal to grant Plaintiffs a hold on the Second Dell Sale during the first quarter of <u>2008</u> breached the WICTC.  Whether or not Plaintiffs had a hold in 2007 or the Dell account transferred prior to January 1, 2008 is not relevant to this question.  As set forth above, regardless of the account transfer date or account status, nothing in the WICTC obligated Informatica to grant Donaldson a

---

[5] To the extent Plaintiffs suggest that Stoner testified elsewhere in her deposition that a hold request "shall be" granted if the opportunity is active, see Pls.' Opp. Br. at 10, nothing in the deposition excerpts currently attached as evidence support that assertion.

hold during the first quarter of 2008.

Third and finally, Plaintiffs argue that it is undisputed that Dell was an active opportunity for them in the first quarter of 2008 and that Informatica acted in bad faith by failing to evaluate and grant Donaldson's hold request in light of that active opportunity. Pls.' Opp. Br. at 14-15. This argument is without merit. As set forth more fully in Section II.B., supra, I cannot invoke the good faith doctrine to read into the WICTC a requirement that Informatica approve every hold requested on any active opportunity in a transferred account, thereby overriding the WICTC's express terms. Moreover, Plaintiffs have not pointed to any record evidence from which a reasonable jury could conclude that Informatica violated any implied duty of good faith in this case. To the contrary, the undisputed record evidence shows that, whether through a "swap" or a one-year hold, Plaintiffs had a full year (2007) after the Dell account otherwise would have transferred to work on closing the first and second Dell deals. It also is undisputed that Plaintiffs would have received 100% commissions if the Second Dell Sale had closed in 2007.[6] Plaintiffs further admit that they asked for – and Informatica granted – special incentives for Dell to close by the end of 2007, and that they undertook self-described "heroic" efforts to close the Second Dell Sale by that date but were unable to do so. Capuano Dep. at 96-99; Donaldson Dep. at 164. Moreover, Informatica approved a split arrangement on the Second Dell sale for the first quarter of 2008 and paid Plaintiffs 25% commissions in accordance with the terms of that arrangement. The record evidence shows that Capuano participated actively in the split negotiations. See, e.g., Capuano Dep. (Docket No. 76-3) at 94-96, Ex. . Although Plaintiffs might have preferred or felt entitled to a more favorable arrangement, Informatica's actions in this regard, even when viewed in the light most favorable to Plaintiffs, were appropriate under the WICTC and are in no way indicative of bad faith under

---

[6] Indeed, Plaintiffs received 100% commission on the First Dell Sale that closed within that year.

20

Pennsylvania law.[7]

For all of the above reasons, Defendant's motion for summary judgment with respect to Plaintiffs' breach of contract claim is granted.

### 2. Detrimental Reliance

Donaldson claims that he detrimentally relied on a promise by Informatica to pay him 100% of his commission for the Second Dell Sale coupled with an expectation by Informatica that Donaldson would close that sale without assistance from any other salesperson. Am. Compl. ¶¶ 62-64 (Count Two).  Capuano similarly claims that he detrimentally relied on "Informatica's contractual obligation to pay him pursuant to the WICTC coupled with . . . Informatica's expectation that . . . Capuano would participate in closing" the Second Dell Sale. Id. ¶¶ 95-97 (Count Eight). Defendant argues that because there is a valid enforceable contract – the WICTC – that governs these matters, Plaintiffs' detrimental reliance counts must be dismissed.

A cause of action for detrimental reliance or promissory estoppel arises when a party relies to his detriment on the representations of another party. See Synesiou v. DesignToMarket, Inc., No. 01-5358, 2002 WL 501494, at *4 (E.D. Pa. Oct. 22, 2001) (citing Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 416 (3d Cir. 1990), and Thomas v. E.B. Jermyn Lodge No. 2, 693 A.2d 974, 977 (Pa. Super. Ct. 1997)).  To prevail on a detrimental reliance claim, a plaintiff must prove that: (1) the promisor made a promise he reasonably expected to induce action or forbearance on the part of the promisee; (2) the promise did induce action or forbearance by the promisee; and (3)

---

[7] Plaintiffs' argument that Capuano was coerced into agreeing to the split arrangement does not change this conclusion.  It is undisputed that Capuano entered into split negotiations with the Froebe-Johnson team in January 2008 and that Capuano wrote an e-mail to Monica Froebe on January 16, 2008 agreeing to a 50/50/25 split.  It is also undisputed that Informatica paid Plaintiffs in accordance with this arrangement.  Although Capuano later testified in his deposition that he felt coerced into agreeing to the split, he confirmed the split arrangement in an e-mail to Stoner who investigated Donaldson's complaint about the arrangement.  Docket No. 83-14.  Capuano also admits he never told Stoner he felt pressured to accept the split.  Capuano Dep. at 132.  Moreover, and in any event, nothing about the split negotiations changes the fact that nothing in the WICTC entitled Plaintiffs to a hold and/or 100% commissions on the Dell account in 2008.

injustice can only be avoided by enforcing the promise. Carlson, 918 F.2d at 416. It is well-established that the doctrine of detrimental reliance only applies to enforce a promise that is not supported by consideration, i.e., when there is no binding contract. See Synesiou, 2002 WL 501494, at *4. Accordingly, promissory estoppel does not apply when the parties have entered in to an enforceable agreement. Id.; see also Carlson, 918 F.2d at 416 (where parties have formed an enforceable contract, promissory estoppel claim is unwarranted); Benchmark Group, Inc. v. Penn Tank Lines, Inc., Civ. A. No. 0-2630, 2008 WL 282694 (E.D. Pa. Jan. 30, 2008) (same).

Here, it is undisputed that the parties entered into an enforceable written contract – the WICTC. Indeed, as set forth infra, Plaintiffs withdraw their quantum meruit claims on the grounds that "an enforceable contract formed the basis of the relationship for the parties." Pls.' Br. Opp. at 16. Plaintiffs also state in the "promissory estoppel" section of their opposition brief that they "do not dispute that there was an express contract governing the relationship between the parties." Id. at 15. Although Plaintiffs suggest that Defendant believes that Section F of Appendix 2 to the WICTC is unenforceable, this argument is without merit. To the contrary, the primary basis for Defendant's motion for summary judgment on this claim is the existence and applicability of the WICTC, including Section F. Because the law is clear that promissory estoppel does not apply where the parties have formed an enforceable contract, Plaintiffs' detrimental reliance claim must be dismissed.[8]

### 3.    Quantum Meruit

Plaintiffs state in their Brief in Opposition that "an enforceable contract formed the basis of the relationship for the parties," and, therefore, "Plaintiffs withdraw their claims for Quantum Meruit." Pls.' Br. Opp. (Docket No. 81) at 16. Accordingly, Defendant's Motion for Summary

---

[8] Moreover, and in any event, Plaintiffs admit that Informatica never promised them a hold or 100% of the commissions on the Second Dell Sale. See Donaldson Dep. at 113. For this reason as well, the detrimental reliance claim fails.

22

Judgment is granted with respect to Plaintiffs' quantum meruit claims set forth in Counts Three and Nine of the Amended Complaint.

### 4.    Pennsylvania Wage Payment and Collection Law

In Count Four of the Amended Complaint, Donaldson asserts a WPCL claim for wages against Informatica. Am. Complaint ¶¶ 68-75. It is well-established that the WPCL does not create a right to compensation, but rather provides a statutory remedy when an employer breaches a contractual obligation to pay earned wages. See DeAsencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003). As set forth above, there is no evidence that Informatica had any contractual obligation to pay Donaldson the commissions and/or other wages he seeks in this lawsuit. Accordingly, Donaldson's WPCL claim fails as a matter of law, and Defendant's motion for summary judgment as to this claim is granted. See, e.g., Weldon v. Kraft, Inc., 896 F.3d 793, 801 (3d Cir. 1990); Mavrinac v. Emergency Med. Ass'n of Pittsburgh, No. 2:04 CV 1880, 2005 WL 2304995, at *8 (W.D. Pa. Sept. 21, 2005).

### 5.    Defamation *Per Se*

Donaldson's defamation *per se* claim against Informatica (Count Five) is based solely on the January 16, 2008 e-mail that Paul Hoffman intended to send to Informatica CEO Sohaib Abbasi, but inadvertently sent to Donaldson first. Am. Compl. ¶¶ 76-80.[9] To establish a claim for defamation in Pennsylvania, a plaintiff must show: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. See Pa. Cons. Stat. Ann. § 8343(a). Defendant raises four arguments in support of its motion for summary judgment on the

---

[9] The text of the January 16, 2008 e-mail is set forth in full in Section I.A.4, supra.

defamation claim: (1) the e-mail is not capable of defamatory meaning as a matter of law; (2) Informatica did not publish the e-mail to a third party; (3) the e-mail was conditionally privileged as a matter of law and there is no evidence that Informatica abused the privilege; and (4) Donaldson cannot show that he was harmed by the e-mail. After careful consideration of the parties' arguments, I agree that summary judgment in favor of Informatica on this claim is warranted. Specifically, as set forth more fully below, I find that even if the e-mail is capable of defamatory meaning[10] – which is doubtful when viewed in context – no reasonable jury could find based on the record evidence that Informatica abused a conditional privilege or that Donaldson suffered any harm.[11]

---

[10] A "statement is defamatory ' if it tends to harm an individual's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him.'" Pacitti v. Durr, Civ. A. No. 05-317, 2008 WL 793875, at *15 (W.D. Pa. Mar. 24, 2008) (quoting U.S. Healthcare v. Blue Cross of Greater Phila., 898 F.2d 914, 92 (3d Cir. 1990)), aff'd, No. 08-2105, 2009 WL 325760 (3d Cir. Feb. 11, 2009); see also Green v. Mizner, 692 A.2d 169, 172 (Pa. Super. Ct. 1997) ("A publication is defamatory if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession."). "Statements which are merely annoying or embarrassing or no more than rhetorical hyperbole or a vigorous epithet are not defamatory." Kryeski v. Schott Glass Techs., Inc., 626 A.2d 595, 601 (Pa. Super. Ct. 1993) (internal quotations omitted). Likewise, "statements of opinion, without more, are not actionable." Green, 692 A.2d at 174. In determining whether a communication is capable of having defamatory meaning, the court "must view the statement 'in context' with an eye toward 'the effect [the statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir. 2001) (quoting Baker v. Lafayette College, 532 A.2d 399, 402 (Pa. 1987)); see also Green, 692 A.2d at 172.

[11] I disagree with Defendant's argument that because Hoffman only sent the e-mail to three upper-level executives within Informatica, the e-mail was not "published" to a third-party within the meaning of Pennsylvania defamation law. Def.'s Br. Supp. at 17. The only case Defendant cites in support of this proposition is a 1984 case out of the District of Columbia. See id. (citing Howard Univ. v. Best, 484 A.2d 958, 989 (D.C. 1984)). The District of Columbia Court of Appeals, however, in a subsequent case, clarified that in Best, the publication issue was limited to alleged dissemination of a defamatory report outside the university and that the Best court did not decide whether dissemination of a defamatory report within a faculty, or within a group of employer-supervisors and their assistants, is a "publication." Citing the Restatement (Second) Torts § 577(1), the court held that "it is clear that any communication to someone other than the person defamed is a publication. Thus, the basis, if any, for excusing dissemination of a defamatory report within a faculty (as in Best) or within an employment group as in this case is not the lack of a publication but the existence of a qualified privilege." Dist. of Columbia v. Thompson, 570 A.2d 277, 292 (D.C. 1990), vacated and remanded on rehearing, 593 A.2d 621 (D.C. 1991). I recognize that the Thompson court later vacated its opinion on the defamation claim on rehearing, not based on the merits, but on jurisdictional grounds. 593 A.2d at 636. Although vacated, the opinion is still instructive as to why Informatica's argument misconstrues Best and the law on the publication issue. See also Pls.' Br. Opp. at 19.

24

### a. **Conditional Privilege**

A party may defend a defamation action by showing that a statement was made pursuant to a conditional privilege. See Pacitti, 2008 WL 793875, at *16. A statement is conditionally privileged "if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know." Id. (quoting Daywalt v. Montgomery Hosp., 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990)); see also Restatement (Second) Torts § 596.

Donaldson does not dispute that the e-mail at issue was conditionally privileged.[12] Rather, he argues that Hoffman acted maliciously and, therefore, abused that privilege. A defendant abuses and therefore waives a conditional privilege when "the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given or to a person not reasonably believed to be necessary to the accomplishment of the purpose of the privilege." Green, 692 A.2d at 175; see Pacitti, 2008 WL 793875, at *16. It is the plaintiff's burden to show abuse of a conditionally privileged occasion. See 42 Pa. Cons. Stat. Ann. § 8343. In support of his malice argument, Donaldson focuses solely on the second paragraph of Hoffman's e-mail addressing his performance on prior deals:

> If he wants to talk about integrity, I would encourage him to be honest enough to tell you the full true story. I notice he didn't mention the names of the other big deals he did – probably because one was Abbott Labs – which is the ugly one they did

---

[12] I agree that a conditional privilege applies in this case. Donaldson's defamation claim is based solely on the January 16, 2008 e-mail from Hoffman to Abbasi. Hoffman only sent that e-mail after and in direct response to a lengthy e-mail Donaldson sent to Abbasi the day before, with a copy to Hoffman, setting forth Donaldson's case for receiving 100% commissions on the Second Dell Sale. See Docket No. 83-19. Hoffman testified in his deposition that his intent in sending the January 16, 2008 e-mail was "to clarify my understanding of what the facts were versus the facts as they were represented by Lee." Hoffman Dep. (Docket No. 76-6) at 36. In addition to his interest in the subject matter as Executive Vice President of Worldwide Field Operations, Hoffman was entitled to present his side of the story in response to a communication initiated by Donaldson. It also is undisputed that the intended recipients of the e-mail – Abbasi as CEO, Stoner as Senior Vice President of Human Resources, and Crosby as Senior Vice President of Sales for the Americas – all had an interest in Hoffman's assessment of Donaldson's claims. There is no evidence that the e-mail was sent to anyone other than these three individuals and Donaldson. Courts have routinely held that a conditional privilege exists in employment situations such as this. See, e.g., Easton v. Bristol-Myers Squibb Co., 289 F. Supp. 2d 604, 613 n.8 (citing cases and stating that "[t]he conditional privilege, often referred to as the 'common interest' privilege, is regularly applied to such intra-organizational communications concerning employees").

25

without appropriate approvals. The other interesting question is why he feels YOU are the only one in a position to correct this – when he and I talked at the kickoff and he never mentioned it to me – probably because he knows that I know the facts!

Donaldson Dep. (Docket No. 76-2) at 139, Ex.19. Specifically, Donaldson argues that "Hoffman's publication of the defamatory e-mails was actuated by malice insofar as he was aware that he blatantly and intentionally misrepresent[ed] Donaldson's efforts and success on the Lilly and Abbott sales – in complete contravention of known facts and truth – as evidenced by the congratulatory e-mails he had written months prior." Pls.' Opp. Br. at 19-20.

I disagree that the record evidence raises a jury question as to malice. Other than his own subjective opinion and conclusory allegations, the only evidence Donaldson cites in support of his "malice" argument consists of two short e-mails Hoffman sent in June 2005 and December 2006 to the sales teams on the Eli Lilly and Abbott Labs deals concerning the successful closing of those deals. See Pls.' App'x, Ex. 19 (Docket No. 83-20). The e-mails are directed to multiple members of the sales teams and do not single out Donaldson specifically. Without more, these two generic congratulatory e-mails are simply insufficient to create a genuine issue of fact as to whether Hoffman acted with malice in January of 2008. Among other things, the e-mails do not contain any facts to counter Hoffman's contention that the Eli Lilly deal was presented to the customer without approvals and Donaldson himself never disputes this fact in his brief. The e-mails further indicate that neither deal was easy and that Hoffman was surprised the deals got done. In addition, the e-mails do not change the fact that Hoffman directed his January 16, 2008 e-mail only to those few executives with an interest in the subject matter and promptly corrected the one acknowledged misstatement of fact contained therein – actions hardly indicative of malice.[13]

---

[13] Hoffman acknowledges that his first January 16, 2008 e-mail contains one misstatement of fact – the deal that was done without approvals was Eli Lilly and not Abbott Labs as stated in the e-mail. Hoffman promptly corrected this information, however, in a second e-mail to Abbasi sent on the same day. See Pls.' App'x, Ex. 19 (Docket No. 83-19). Hoffman does not dispute that Abbott Labs and Eli Lilly eventually closed and the facts in his second January 16, 2008 e-mail are not inconsistent with his 2005 and 2006 e-mails cited by Donaldson. See id.

## c. Special Harm

Donaldson's defamation claim fails for the additional reason that he has not pointed to any evidence of harm resulting from the allegedly defamatory e-mail. Informatica argues that summary judgment is warranted because the Pennsylvania defamation statute requires that a plaintiff show "special harm" – i.e., "monetary or out-of-pocket loss borne by the defamation." Def.'s Br. Supp. at 20 (quoting Walker v. Grand Cent. Sanitation, Inc., 634 A.2d 237, 241-42 (Pa. Super. Ct. 1993)). Donaldson does not dispute that he has not suffered monetary or out-of-pocket loss as a result of the alleged defamation. Rather, he argues that his claim is for defamation *per se*, and that defamation *per se* claimants do not need to show special harm. Pls.' Br. Opp. at 20.

I agree with Donaldson that the special harm requirement does not apply to defamation *per se* cases in Pennsylvania. See, e.g., Walker, 634 A.2d at 242. The Pennsylvania Superior Court, however, has held that a plaintiff in a defamation *per se* case still must prove general damages – *i.e.*, proved, actual harm caused to the reputation of the person defamed. See id. at 244-45 (adopting Restatement (Second) Torts § 621); see also Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 581-82 (E.D. Pa. 1999) (same). Here, even assuming that Donaldson's defamation claim rises to the level of defamation *per se*, he does not argue anywhere in his brief that he suffered any harm and does not point to any record evidence of such harm. Accordingly, Informatica's summary judgment motion is granted as to the defamation claim for this reason as well.[14]

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment is denied and

---

[14] Although he does not raise it in his brief, Donaldson testified in his deposition that he felt that he was placed on a performance improvement plan ("PIP") in November 2008 because of Hoffman's e-mail eleven months earlier. Donaldson Dep. (Docket No. 76-2) at 269-70. There is no evidence, however, linking the January 16, 2008 e-mail and the PIP. Indeed, when asked at his deposition what facts connected the two events, Donaldson testified only that "I think they're linked." Id. at 270.

Defendant's Motion for Summary Judgment is granted.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Lee A. Donaldson,                          )
John Capuano,                              )
                                           )
          Plaintiffs,                      )
                                           )  Civil Action No. 08-605
     vs.                                   )
                                           )
Informatica Corporation,                   )
                                           )
          Defendant.                       )
                                           )

AMBROSE, District Judge

## ORDER OF COURT

AND NOW, this 30th day of November, 2009, after careful consideration of the submissions

of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ordered

that Defendant Informatica Corporation's Motion for Summary Judgment (Docket No. 73) is

granted. It is further ordered that Plaintiffs' Motion for Partial Summary Judgment (Docket No. 77)

is denied.

BY THE COURT:

/s/ Donetta W. Ambrose
Donetta W. Ambrose
U.S. District Judge